Esther R. KOCIEMBA and William J.
Kociemba, Plaintiffs,

v.

G.D. SEARLE & CO., Defendant.

Civ. No. 3–85–1599.

United States District Court,
D. Minnesota,
Third Division.

Feb. 1, 1988.

Michael V. Ciresi, Roger P. Brosnahan, David L. Suggs, Roberta Walburn of Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for plaintiffs.

Michael Berens, Madge S. Thorsen, Paula D. Osborn of Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., and Paul Strain of Venable, Baetjer & Howard, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RENNER, District Judge.

### INTRODUCTION

Before the Court are the parties' cross-motions for summary judgment and declaratory judgment pursuant to Fed.R.Civ.P. 56 and 57. On October 23, 1987, the Court held a hearing on the motions and took them under advisement. The Court also heard arguments on defendant's in limine motions brought pursuant to Fed.R.Evid. 401, 402, 403, 404, and 407. These non-dispositive motions will be addressed in a separate opinion.

Defendant G.D. Searle attacks plaintiffs' seven count complaint on numerous grounds. First, defendant seeks summary judgment on the entire complaint based on principles of federal preemption.

Second, defendant moves for partial summary judgment on all counts of the plaintiffs' complaint except for those allegations in Count One addressing negligent manufacture of the Cu–7 IUD. Defendant bases this motion on its assertion that it provided

the plaintiff's [1] physician with adequate warnings regarding the risks of IUD insertion.

Third, defendant moves for partial summary judgment as to Counts Three and Four, alleging breaches of implied and express warranties, respectively, on the grounds said causes of action are time-barred by the applicable Minnesota statutes of limitation.

Fourth, defendant moves for partial summary judgment as to those allegations in Counts One and Six alleging misrepresentation. Defendant bases this motion on its assertion that plaintiffs have not identified any specific acts of misrepresentation relied on by plaintiffs or Esther Kociemba's physician. In the same motion, defendant seeks summary judgment as to Count Five of plaintiffs' complaint. Defendant argues that the Minnesota Consumer Fraud Act, which serves as the basis for this count, is not, as a matter of law, appropriate for use in products liability cases, especially those cases involving the highly-regulated prescription drug industry.

Plaintiffs have filed a cross motion seeking a declaratory judgment, pursuant to Fed.R.Civ.P. 57, declaring that defendant had a duty to directly warn Esther Kociemba of the risks and hazards associated with her use of the Cu–7 IUD. Alternatively, plaintiffs seek summary judgment, pursuant to Fed.R.Civ.P. 56, on this issue.

Plaintiffs further seek summary judgment as to defendant's fourth affirmative defense alleging contributory negligence. Finally, pursuant to Fed.R.Civ.P. 12(f), plaintiffs move this Court to dismiss defendant's fifth, tenth, and eleventh affirmative defenses alleging failure to mitigate damages, lack of personal jurisdiction, and improper venue, respectively.

After careful review, the Court denies all of defendant's motions for summary judgment. The Court further denies plaintiffs' motion for declaratory judgment and alternative motion for summary judgment.

However, the Court grants plaintiffs' motion for summary judgment as to defendant's fourth affirmative defense. Moreover, without objection from defendant, plaintiffs' motion to dismiss the defendant's fifth, tenth, and eleventh affirmative defenses is also granted.

FACTS

G.D. Searle decided to market the Cu–7 intrauterine contraceptive device ("IUD") in the United States in 1970. At that time, the Federal Food and Drug Administration ("FDA")—the federal agency charged with overseeing the prescription drug industry—considered all IUDs, including the Cu–7, as medical devices. Prior to the passage of the Medical Device Amendments of 1976, Pub.L. 94–295, § 1(a), 90 Stat. 539 (codified as amended in scattered sections of Titles 15, 21, and 42 U.S.C.), medical devices were generally not within the province of the FDA. Therefore, pre-market clinical testing was not required.

Nevertheless, Searle commenced clinical testing of the Cu–7 before distributing it on the open market. In March of 1971, the FDA decided to reclassify all medical devices incorporating heavy metals as prescription drugs subject to the rules and regulations covering all such drugs. 21 C.F.R. § 310.502. The parties agree that the above-cited regulation includes the copper-based Cu–7. The relevant parts of section 310.502 took effect in February of 1973, prior to the time the defendant began distributing the Cu–7. Thus, Searle was required to obtain FDA approval for the sale and distribution of the Cu–7 as set forth in Section 505 of the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), 21 U.S.C. § 355 (1987).

Subsequently, Searle submitted its application for the Cu–7 to the FDA. On February 25, 1974, the FDA notified Searle that the Cu–7 had been approved as a prescription drug for sale and distribution in accordance with the FDCA.

---

1. Both Esther Kociemba and her husband, William, are named plaintiffs in this action. Any reference to a single plaintiff should be construed as a reference to Esther Kociemba unless otherwise specified.

After receiving approval to manufacture and distribute the Cu–7, Searle began a marketing campaign designed to encourage physicians, as well as potential consumers, to use the Cu–7. Searle contemplated, but never implemented, direct consumer advertising of the Cu–7. Searle did, however, issue press releases to media throughout the country promoting the Cu–7's safety and effectiveness. Searle also placed informational brochures regarding the Cu–7 in physicians' waiting rooms to attract the attention of potential users.

On June 6, 1977, Esther Kociemba went to her physician, Dr. Timothy Scanlan, at the Melrose Clinic in Melrose, Minnesota, to request an IUD. She did so, in part, because of her concern over the reported risks of the oral contraceptives she was then taking. Esther Kociemba did not specifically request the Cu–7.

Dr. Scanlan inserted the Cu–7 that day. At that time, Searle provided a patient brochure with each Cu–7 that read:

What serious complications have been reported?

Pelvic infections have been reported following insertion of the Copper 7. These can occur anyway, but it is certainly possible for the Copper 7 to pick up germs in the vagina and carry them into the uterus on insertion. Even though the Copper 7 was packaged sterile, the vagina is not sterile. Most infections can be eliminated by antibiotic therapy, but if not, the Copper 7 should be removed.

Dr. Scanlan believes that he did not receive the brochure and therefore, did not give it to plaintiffs.

Even if Esther Kociemba saw the warning, it did not mention the possibility of Pelvic Inflammatory Disease ("PID") or the risk of infertility. In defendant's favor, warnings specifically citing the risk of PID were not required by FDA regulation until November 7, 1977—five months after Esther Kociemba received her Cu–7. 21 C.F.R. § 310.502.

A separate warning was also provided by Searle for exclusive use by the physician. That warning stated, in part, that "[u]ncommonly, pelvic infection has been reported" and that an "aseptic technique" should be employed for insertion. The physician's warning, like the patient brochure, did not provide a specific warning regarding the possibility of PID.

Twelve days after her Cu–7 was inserted, Esther Kociemba awoke with severe cramping caused by an infection. Dr. Scanlan diagnosed the infection as mild endometritis and treated it with the antibiotic Keflex. The infection disappeared within a month.

Plaintiff continued wearing her Cu–7 for almost a year and a half, until November, 1978, when she and her husband decided to begin a family. At plaintiffs' request, Dr. Klotter of the River's Edge Clinic, removed the Cu–7. Klotter told the plaintiffs to return to his office in six months if Mrs. Kociemba was not pregnant. The Kociembas returned to Dr. Klotter's office in June, 1978 because Esther Kociemba had not conceived. Dr. Klotter instructed Mrs. Kociemba to check her cycle and basal temperature and to engage in sexual intercourse on a monthly basis when ovulating.

On August 15, 1980, fifteen months later, the Kociembas returned to Dr. Klotter. Again, they complained of their inability to conceive a child. After examining Mrs. Kociemba, a physician at the River's Edge Clinic noted "no obvious cause of infertility." A follow-up note, written in Esther Kociemba's medical chart on August 28, 1980, indicated that William Kociemba had a low sperm count. Dr. Klotter referred plaintiffs to Dr. David Lees, a specialist in artificial insemination. Dr. Lees treated Esther Kociemba from October 30, 1980 through 1982.

On January 18, 1982 Dr. Lees performed a hysterosalpingogram ("HSG") on Esther Kociemba. As a result of the test, he concluded that plaintiff's fallopian tubes were blocked. Dr. Lees gave Esther Kociemba no reason for the blockage.

On March 9, 1982 Dr. Lees performed an exploratory laparotomy and bilateral salpingoplasty on Esther Kociemba. Following the surgery, Dr. Lees remained un-

certain as to why the ends of plaintiff's fallopian tubes were blocked.

In April, 1982, Dr. Lees referred plaintiffs to Drs. Tagatz and Nagel at the University of Minnesota Hospitals. During plaintiff's first appointment with Dr. Tagatz, Dr. Kreider, a resident assisting Drs. Nagel and Tagatz, met with plaintiff to take her medical history. Dr. Kreider and Esther Koceimba discussed plaintiff's infertility problem at that time. During their discussion, Kreider suggested that PID, caused by the Cu–7, was the cause of plaintiff's infertility. Plaintiff stated in deposition testimony that the April, 1982, discussion with Dr. Kreider was the first time she ever heard of a connection between her use of the Cu–7 and her infertility. Deposition of Esther Kociemba, December 19, 1985, p. 72.

Esther Kociemba continued seeing physicians at the University of Minnesota Hospitals through 1984. In February, 1983, a Dr. Soderberg performed an infertility work-up. In June, 1984, an HSG was cut short when Kociemba had a seizure during the test. Shortly thereafter, plaintiff saw Dr. Nagel for the last time. During that last meeting, Nagel informed Kociemba that her infertility was related to her use of the Cu–7 and PID. On October 1, 1984, the Kociembas commenced this action.

Plaintiffs' complaint contains seven counts. Count One alleges that the defendant negligently designed, tested, manufactured, promoted, labeled, distributed, and sold the Cu–7 so as to provide plaintiffs with an unsafe product. Count One further alleges that the defendant negligently, fraudulently, and intentionally misrepresented the effects of the Cu–7 and failed to adequately warn physicians of said defects.

Count Two alleges that defendant manufactured, sold, promoted, and distributed an unreasonably dangerous and defective product and is liable under the doctrine of strict liability.

Count Three alleges defendant's breach of implied warranties of fitness for purpose and merchantability. Count Four alleges defendant's breach of express warranties.

Count Five alleges that defendant intentionally used fraud, misrepresentation, false advertising, and other deceptive practices in violation of Minn.Stat §§ 325F.67, 325F.69, and 8.31 subd. 3a.

Count Six seeks punitive damages for the aforementioned acts.

Finally, under Count Seven, William Kociemba seeks damages for loss of consortium.

### Applicable Law

Under Fed.R.Civ.P. 56(c), the Court is required to grant summary judgment

> if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there is no genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## I. DEFENDANT'S MOTIONS

### A. PREEMPTION

The doctrine of federal preemption arises from the Supremacy Clause of the United States Constitution. That clause, in pertinent part, provides:

> This Constitution and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2.

Federal law may preempt state law in any of three ways:

> First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express pre-emptive language, Congress may in-

dicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible. . . .

*Michigan Canners and Freezers Association, Inc. v Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citations omitted). *Accord California Federal Savings and Loan v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987).

■ Defendant first contends that Congress explicitly occupied the field of IUD regulation by enacting Section 2 of the Medical Device Amendment of 1976, Pub.L. 94–295, 90 Stat. 574, 21 U.S.C. § 360k (1976). However, that section is here inapplicable. Section 360k, subsection (a) provides:

(a) Except as provided in subsection (b) [provisions not applicable here], no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

The FDCA makes clear that medical devices and prescription drugs are mutually exclusive terms. 21 U.S.C. § 321(g)(1) (1972). Since section 360k is only applicable to medical devices and the FDA considers the Cu–7 to be a prescription drug, section 360k simply does not apply. Moreover, even if the Court credits defendant's argument that section 360k should apply in this instance, it is doubtful that the term "requirement" as used in section 360k is broad enough to encompass an action pursued under state tort law. Absent statutory or regulatory language or legislative history to the contrary, the Court reads the statute to only preclude state statutes, regulations, or local laws regulating medical devices.

■ Defendant next contends that congressional intent to occupy the field of safety regulation in drug design, testing, and labeling should be implied, in this case, because of the pervasive scheme of regulations the FDA has promulgated pursuant to the FDCA. Defendant can not show, however, that Congress or the FDA ever intended to preempt state tort law through pervasive regulation of IUDs.

Congress can preempt state law by implicitly or explicitly occupying a field. *Rice v. Santa Fe Elevators Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). However, "[i]n the absence of express preemption there is a strong presumption that Congress did not intend to displace state law." *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483, 1489 (D.Kan.1987), *citing Maryland v. Louisiana,* 451 U.S. 725, 726, 101 S.Ct. 2114, 2118, 68 L.Ed.2d 576 (1981).

It is defendant's burden, as moving party, to prove that Congress, or the FDA pursuant to their congressional grant of authority, fully intended to completely occupy the field of IUD regulation to the extent it would preclude state tort actions against IUD manufacturers. Defendant has not met this burden.

Defendant makes a strong case that the federal government, through the FDA, has undertaken a comprehensive effort to regulate the development, manufacturing, labeling, and distribution of IUDs, including the Cu–7. However, defendant can point to no statutory or regulatory language or legislative history that lends credence to its conclusion that Congress intended to exclude state tort law. Such an omission is decisive. *Hillsborough County, Florida v. Automated Medical Laboratories Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

In *Hillsborough County,* a unanimous Supreme Court reversed the Eleventh Circuit Court of Appeals and held that federal requirements governing the collection of blood plasma from paid donors did not preempt local county ordinances regulating the same. The Court noted:

We are even more reluctant to infer preemption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

471 U.S. at 717, 105 S.Ct. at 2377.

■ The mere fact that the Cu–7 received FDA approval does not, by itself, indicate that Congress impliedly intended to preclude state tort actions against prescription drug manufacturers. This is especially true in light of the widely held view that FDA regulation of prescription drugs establishes *minimum* standards, both as to design and warning. *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483 (D.Kan.1987). *See also Brochu v. Ortho Pharmeceutical Corp.,* 642 F.2d 652 (1st Cir.1981); *Salmon v. Parke–Davis & Co.,* 520 F.2d 1359 (4th Cir.1975).

■ Finally, defendant contends that a jury verdict in favor of plaintiffs requires a conclusion that the Cu–7 is unreasonably dangerous. Such a finding, defendant argues, is directly in conflict with the FDA finding that the Cu–7 is a safe and effective drug and that the Cu–7 label meets minimum federal requirements. Defendant asserts that such a conflict should be resolved in favor of the federal regulation. In light of *Silkwood v. Kerr–McGee Corp,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443

(1984), the Court is unpersuaded by this argument.

In *Silkwood,* the Supreme Court considered whether an award of punitive damages in a tort action against the manufacturer of plutonium products was in conflict with federal law. The Supreme Court acknowledged that the federal government had occupied the entire field of nuclear safety concerns, except for limited powers expressly ceded to the States. The Court, nonetheless, reversed the Tenth Circuit Court of Appeals and upheld an Oklahoma jury's award of punitive damages [2] to the estate of Karen Silkwood for plutonium injuries suffered by Silkwood. In doing so, the Court wrote:

No doubt there is a tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability.... Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something Congress was quite willing to accept.

464 U.S. at 256, 104 S.Ct. at 625.

Although the above-cited passage was written in reference to the nuclear industry, the rationale is equally compelling in the context of the FDCA.

■ The *Silkwood* Court found no indication that Congress ever considered precluding state tort remedies when it enacted the Atomic Energy Act of 1954. The Court noted:

[t]his silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe

---

2. The Court of Appeals had affirmed the lower court's award of compensatory damages. This

award remain untouched by the Supreme Court.

that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct. 464 U.S. at 251, 104 S.Ct. at 623. Again, such rationales apply here. If Congress wants to take the extraordinary step of giving drug manufacturers immunity from personal tort actions, it would expressly state such intentions whether by statute or legislative history.

As *Silkwood* suggests, state tort law may have some regulatory effect on federal laws and regulations, however, such effect does not conflict in such a manner that compliance with both federal and state law is impossible. For this reason, and for the reasons stated above, this Court denies defendant's motion for summary judgment on federal preemption grounds.

## B. ADEQUACY OF WARNING AND COMMENT K EXCEPTIONS TO STRICT LIABILITY.

Minnesota has adopted § 402A of the Restatement (Second) of Torts which imposes strict liability on the manufacturers of a defective or unreasonably dangerous product. *McCormack v. Hankscraft Co., Inc.*, 278 Minn. 322, 336–341, 154 N.W.2d 488, 499–501 (1967). Comment k to § 402A provides an exception to the strict liability rule in circumstances where a product is "unavoidably unsafe" if not accompanied by an adequate warning.[3]

Minnesota state courts have yet to address the question of adoption of comment k of the Restatement (Second) of Torts

§ 402A. The Minnesota Supreme Court has, however, specifically adopted or approved several other comments under Section 402A. *See Farr v. Armstrong Rubber Co.*, 288 Minn. 83, 89–91, 179 N.W.2d 64, 69–70 (1970) (comments g, h, i, and m); *Olson v. Village of Babbitt*, 291 Minn. 105, 109–111, 189 N.W.2d 701, 705 (1971) (comment 1); *Magnuson v. Rupp Mfg. Inc.*, 285 Minn. 32, 38–40, 171 N.W.2d 201, 206 (1969) (comments g, h, i, j); *Holm v. Sponco Mfg. Inc.*, 324 N.W.2d 207, 213 (Minn.1982) (comment c). This Court has no doubt that the Minnesota Supreme Court would adopt comment k when that issue is properly before it. Accordingly, defendant's comment k argument must be addressed.

■ Searle maintains that the Cu–7, and, for that matter, all prescription drugs are "unavoidably unsafe." Accordingly, Searle suggests that comment k protection should apply to the Cu–7 as a matter of law, and the strict liability count should be dismissed. Searle further argues that since Minnesota appellate courts have merged the concepts of negligence and strict liability in products liability design defect cases, summary judgment is appropriate for all counts alleging design defects. The Court declines to rule by summary judgment in defendant's favor on either argument.

First, comment k protection is applicable only if any "unavoidably unsafe" product is accompanied by an adequate warning. In this instance, there are genuine issues of material fact as to whether Searle gave

---

**3.** Comment k specifically provides that:
There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot be legally sold except to

physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

adequate warnings to Dr. Scanlan, as well as to the medical community-at-large.[4] Plaintiffs assert that although Searle knew that PID was a common problem caused by Cu–7s, Searle did not warn as such on the label of the Cu–7. The adequacy of the warning must be resolved by the factfinder.

■ Second, even if a factfinder concludes that Searle provided adequate warnings on the Cu–7, a factual question remains as to whether Cu–7 is "unavoidably unsafe" and therefore subject to comment k protection.

The Court rejects defendant's contention that comment k was intended to provide all prescription drugs with blanket immunity from strict liability claims. The language of comment k itself mandates this conclusion. *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297 (1987).

In *Toner,* the Idaho Supreme Court rejected defendant's claim that comment k extended to all prescription drugs by noting:

> [C]omment [k] refers to *"some"* products which are unavoidably unsafe; the comment states such products are "especially *common* in the field of drugs"; the comment cites certain examples from the field and notes "[t]he same is true of *many* other drugs ..." and "in particular *many* new or experimental drugs." Obviously, the comment does not apply to *all* drugs.

*Id.* 732 P.2d at 308 (emphasis in original). The Fourth Circuit Court of Appeals, as well as state courts in Utah and Colorado, have also held that prescription drugs are not entitled to comment k protection as a matter of law. *Wheelahan v. G.D. Searle & Co.,* 814 F.2d 655 (4th Cir.1987) (Cu–7 IUD); *Patten v. Lederle Laboratories,* 676 F.Supp. 233 (D.Utah 1987); *Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118, 122 (Colo.1983). *Contra Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d

87 (2nd Cir.1980); *McKee v. Moore,* 648 P.2d 21 (Okla.1982); and *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975, 977–978 (1978).

To gain comment k protection a manufacturer must bear the burden of proving that the manufactured product, the Cu–7 in this instance, is *unavoidably unsafe* or *reasonably dangerous. Toner,* 737 P.2d at 307. In the language of comment k, the product must "in the present state of human knowledge, [be] quite incapable of being made safe for [its] intended and ordinary use." *Id.* Factors that must be considered in deciding whether a product is unavoidably unsafe include: (i) whether the product could have been designed in a safer manner; (ii) whether a safer alternative product could have been available at that time to accomplish the same intended purpose as the product in question; and (iii) whether the benefits of the product outweigh the interest in promoting enhanced accountability on the part of the manufacturer. *Patten v. Lederle Laboratories, supra.*

The above-cited factors clearly raise material factual questions that preclude summary judgment.[5]

### C. TOLLING OF THE STATUTE OF LIMITATIONS FOR THE BREACH OF WARRANTY CLAIMS.

■ Searle next moves for summary judgment on Counts Three and Four of plaintiffs' Complaint. These counts allege that defendant breached implied and express warranties. Defendant argues that these warranty claims are barred by the four-year statute of limitation found in Minn.Stat. § 336.2–725.

Minnesota Statute § 336.2–725 provides in pertinent part:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued....

---

4. The extent of the warning the defendant was required to give directly to the plaintiff is discussed in Section II,A, below.

5. Because the Court is denying defendant's motion on the strict liability issue, we need not, at this time, reach the issue of whether comment k would, in this jurisdiction, foreclose a design defect claim based on a negligence theory.

(2) A cause of action accrues when the breach, occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and the discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

\* \* \* \* \* \*

(4) This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this chapter becomes effective.

Plaintiffs do not dispute that Minn.Stat. § 336.2–725 is applicable. Rather, they contend that the statute has been tolled because: 1) defendant fraudulently concealed the cause of action; 2) defendant is estopped by its conduct from asserting the statute of limitations as a defense; and/or 3) defendant expressly warranted the future performance of the Cu–7 by including a label on the product which recommended its use for up to 24 months.

The Minnesota Supreme Court has consistently held that fraudulent concealment tolls the statute of limitation. *DeCosse v. Armstrong Cork Co.*, 319 N.W.2d 45 (Minn.1982); *Schmucking v. Mayo*, 183 Minn. 37, 235 N.W. 633 (1931). The language of Minn.Stat. § 336.2–725, its supporting comments, and subsequent case law suggest that the doctrine of fraudulent concealment extends to breach of warranty claims.

The official comment to Minn.Stat. § 336.2–725 makes clear that the statute's drafters intended to introduce a uniform statute of limitations for sales contracts. In so doing, however, the drafters did not intend to "alter or modify in any respect the law on tolling of the statute of limitations as it now prevails in the various jurisdictions." Minn.Stat.Annot. § 336.2–725, Uniform Commercial Code Comment, p. 777.

The Minnesota comment to subsection 2–725(2) specifically rejects Searle's argu-

ment that Esther Kociemba's ignorance of Searle's breach of warranties does not affect the running of the statute. As the writer of the Comment states:

> [Subsection 2–725(2)] does not, however, explicitly cover the case in which the breaching party fraudulently conceals the breach from the aggrieved party. Under prior law the limitation period did not run during the time the party in breach successfully concealed the breach.

Minn.Stat.Annot. § 336.2–725, Minnesota Code Comment, p. 776.

Although the official comments to the UCC do not carry the weight of law, they should be given considerable deference if such comments do not conflict with the statute. *In re Rivet*, 6 UCC Rep. 460 (E.D. Mich.1969); *Young v. Kaye*, 443 Pa. 335, 9 UCC Rep. 713, 279 A.2d 759 (1971). Moreover, contrary to defendant's assertion, no Minnesota cases directly contradict the comment writer's conclusion.

Indeed, Minnesota cases support the comment writer's conclusions that the doctrine of fraudulent concealment is available in warranty cases. In *Freiberg v. Atlas–Turner, Inc.*, 37 UCC Rep. 1592 (D.C.Minn. 1984), Judge Murphy, citing the above-stated Minnesota Code Comment, denied defendant's motion for summary judgment because there were issues of material fact as to whether the defendant fraudulently concealed information regarding the risk of asbestosis. Defendant's argument that *Freiberg* is distinguishable because it is an asbestosis case is without merit.

Furthermore, defendant's reliance on *Vasek v. Warren Grain & Seed Co.*, 353 N.W.2d 175 (Minn.App.1984) and *Agristor Leasing v. Kramer*, 640 F.Supp. 187 (D.Minn.1986) is misplaced. *Vasek* merely stands for the proposition that fraudulent concealment tolls the statute of limitations during the period the fraud is perpetrated upon the plaintiff. This case is silent as to the general application of fraudulent concealment to a warranty cause of action.

In *Agristor Leasing*, the court refused to toll the statute of limitations on fraudulent concealment grounds solely because the

plaintiff did not produce "any evidence which shows that the third-party defendants took affirmative action to conceal any defects." 640 F.Supp. at 191. The court, by no means, held that the doctrine of fraudulent concealment was unavailable in warranty cases as a matter of law.

Plaintiffs have produced extensive evidence supporting their allegations that Searle concealed information that, had it been known earlier, would likely have caused the plaintiffs to file suit earlier. As one example, plaintiffs point to an internal Searle document written in July, 1979 by the head of Searle's Medical Department. The document states that it is against company policy to link pelvic infections with IUDs. Plaintiffs' Trial Brief Appendix 143. The Searle document, written during the same time period Esther Kociemba was seeking medical help to determine the cause of her infertility, creates a genuine issue of fact as to whether Searle fraudulently concealed the cause. Such issues of fact should be reserved for the ultimate factfinder.

Accordingly, Searle's motion for summary judgment on Counts Three and Four is denied.[6]

### D. MISREPRESENTATION

By Searle's final motion for summary judgment, it seeks summary judgment as to those parts of Counts One and Six alleging misrepresentation. It also seeks summary judgment on Count Five which alleges fraud, misrepresentation, false advertising, and other deceptive practices in violations of Minn.Stat. §§ 325F.67, 325F.69, and 8.31 subd. 3a.

With respect to the misrepresentation claims alleged in Counts One and Six, defendant argues that plaintiffs have not identified any actionable misrepresentation that Searle made to plaintiffs, Dr. Scanlan, or the news media which Esther Kociemba relied on in deciding to accept insertion of the Cu–7.

At oral argument, defendant conceded that there are genuine issues of fact as to whether the defendant misrepresented itself to Dr. Scanlan. It is clear to this Court that any misrepresentation relied on by plaintiff's physician, and in turn, relied on by plaintiffs, is actionable. *See Tetuan v. A.H. Robins*, 241 Kan. 441, 738 P.2d 1210 (1987). Summary judgment here is inappropriate.

### E. CONSUMER FRAUD ACT

The Court also rejects defendant's claim that Count Five be dismissed because Minn.Stat. sections 325F.67 and 325F.69 are not applicable to the advertising, sale, and distribution of the Cu–7.

Minn.Stat. § 325F.67 (False statement in advertisement) covers, in part:

Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, or with intent to increase consumption thereof, ... makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an adver-

---

6. This Court's denial of defendant's motion for summary judgment on fraudulent concealment grounds makes analysis of plaintiffs' equitable estoppel and warranty of future performance theories unnecessary. With respect to equitable estoppel however, the Court notes that *Knaysi v A.H. Robins Co.,* 679 F.2d 1366 (11th Cir.1982) and *Allen v. A.H. Robins Co.,* 752 F.2d 1365 (9th Cir.1985) strongly suggest that equitable estoppel is appropriate in this type of case. In contrast, plaintiffs' claim that Searle's warranty of future performance invokes a discovery rule is troubling. Even if this Court would find that the Cu–7 was warranted for up to 24 months, it is doubtful such a warranty would, as plaintiffs suggest, extend the running of the statute of limitations for an indefinite time. Rather, it appears that the four-year statute of limitations would begin to run on June 6, 1979. As this action was filed on October 1, 1984, the Court doubts plaintiffs can rely on the future warranty exception.

tisement of any sort regarding merchandise, ... or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading ... whether or not pecuniary or other specific damage to any persons occurs as a direct result thereof....

Minn.Stat. § 325F.69, in turn, protects consumers from consumer fraud which the Act defines as:

[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person had in fact been mislead, deceived, or damaged thereby....

Minn.Stat. § 325F.69, subd. 1.

Individuals injured by either of the above-cited statutes have a private cause of action to "recover damages, together with costs and disbursements, including the costs of investigation and reasonable attorney's fees." Minn.Stat. § 8.31, subd. 3a.

Defendant contends that the legislature, in enacting these statutes, never intended that they be applicable in products liability litigation. Instead, defendant argues that the Act prohibits only the kind of deceptive or fraudulent tactics used in direct buyer-to-seller sales in cases which occur too quickly or on too small a scale to bring the attorney general's enforcement powers to bear.

This Court disagrees. It is without doubt that a primary purpose in adopting the private attorney general provisions of the Consumer Fraud Act was to encourage lawyers to accept cases where damages may be so small as to erect "financial barriers to the vindication of a plaintiff's right...." *Liess v. Lindemyer*, 354 N.W. 2d 556, 558 (Minn.App.1984). However, defendant can point to no language—in the statute, its legislative history, or subsequent case law—that supports the narrow reading they urge.

Rather, the contrary is true. In *LeSage v. Norwest Bank Calhoun–Isles*, 409 N.W. 2d 536 (Minn.App.1987) the Court of Appeals, reversing the trial court, denied defendant's motion for summary judgment as to the plaintiff's Consumer Fraud Act claim involving the substantial sum of $80,000. Indeed, in that instance, the court found that the "Consumer Fraud Act is broader than common law fraud." *Id.* at 539.

In *Jacobs v. Rosemount Dodge–Winnebago South*, 310 N.W.2d 71 (Minn.1981), the Minnesota Supreme Court extended the protection of the Consumer Fraud Act to cover breaches of express warranties. In *Jacobs*, the court reversed the trial court's reduction of damages and remanded the case for reinstatement of the jury's damage award of $16,621.00 in damages. Neither *LeSage* nor *Jacobs* dealt with the quick or small types of cases the defendant argues are the *only* cases actionable as private causes of action. Yet, in both instances, Minnesota appellate courts held the Consumer Fraud Act applicable. This Court must do the same.

Defendant next argues that the term "merchandise" as used in section 325F.69, subd. 1, and defined in section 325F.68, subd. 2 does not encompass prescription drugs such as the Cu–7. Again, defendant can point to no language in the statute, its legislative history, or subsequent case law supporting that assertion.

Minn.Stat. § 325F.68, subd. 2 defines "merchandise" to include "any objects, wares, goods, commodities, intangibles, real estate, or services." Absent any contrary indication from the legislature, this definition is broad enough to encompass the Cu–7.

Finally, defendant argues that an advertisement of a prescription drug to a physician is not an "advertisement" made "indirectly" to the public within the meaning of Minn.Stat. § 325F.67. This argument is without merit. This very issue was addressed in a New Jersey case in which the defendant argued that the sale of IUDs was outside the purview of that state's

consumer fraud statute. *Jones v. Sportelli,* 166 N.J.Super. 383, 399 A.2d 1047 (1979).

In *Jones,* the court noted that the statute covered sales made "directly or indirectly" to the public. The *Jones* court went on to say that:

> [t]he provision of an IUD to a gynecologist essentially constitutes, at the very least, *an indirect attempt to sell the IUD to a wanting patient with the concomitant expectation of monetary return.*

166 N.J.Super. at 390, 399 A.2d at 1050 (emphasis added). Significantly, the New Jersey statute cited in *Jones* is similarly worded to Minn.Stat. § 325F.67 to the extent that both statutes cover "direct and indirect" outreaches to the public. This Court has no doubt that Cu–7 advertisement to a physician is an "indirect" advertisement to the public as contemplated by Minn.Stat. § 325F.67.

Accordingly, for this reason, and the reasons stated above, defendant's motion for summary judgment as to Count Five is denied.

## II. PLAINTIFFS' MOTIONS

### A. THE LEARNED INTERMEDIARY EXCEPTION

■ It is well settled in Minnesota that a manufacturer of a consumer product has a common-law duty to warn users of potential hazards. *Kallio v. Ford Motor Co.,* 407 N.W.2d 92 (Minn.1987); *Germann v. F.L. Smithe Machine Co.,* 395 N.W.2d 922 (Minn.1986). In many jurisdictions, a "learned intermediary" exception has been established whereby a prescription drug manufacturer fulfills its duty to warn by adequately warning the physician, not the patient, of a drug's potential risk. *Plummer v. Lederle Laboratories,* 819 F.2d 349 (2nd Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464 (5th Cir.1987); *Polley v. Ciba–Geigy Corp.,* 658 F.Supp. 420 (D.Alaska 1987); *Weinberger v. Bristol–Myers Co.,* 652 F.Supp. 187 (D.Md.1986); *Hurley v. Lederle Laboratories,* 651 F.Supp. 993 (E.D.Tex.1986);

*Walker v. Merck & Co.,* 648 F.Supp. 931 (M.D.Ga.1986).

The rationale behind the learned intermediary rule is simple: the physician, as the prescriber of a drug, is in the best position to give a highly individualized warning to a patient based on the physician's knowledge of the patient and the inherent risks of the drug.

In the absence of applicable Minnesota law, plaintiffs move this court for a judgment declaring that, contrary to the learned intermediary rule, Searle had a duty to directly warn Esther Kociemba of the risks and hazards associated with the use of the Cu–7. Alternatively, plaintiffs seek summary judgment on this issue.

The basis for plaintiffs' motion is that prescription contraceptives are, by their very nature, distinguishable from other prescription drugs and should be exempt from the learned intermediary rule. There are compelling arguments favoring this position. Unlike most other prescription drugs, contraceptives are generally not therapeutic, curative, or diagnostic. Their use is, more likely than not, initiated by the patient, not the physician. A woman's heightened participation in the decision-making process as to whether she wants a specific contraceptive encourages the manufacturers of contraceptives to pursue public relation campaigns directed towards the potential user. Plaintiffs argue that this outreach to the ultimate consumer justifies an exception to the learned intermediary rule. Courts in Massachusetts and Michigan agree. *MacDonald v. Ortho Pharmaceutical Corp,* 394 Mass. 131, 475 N.E.2d 65 (1985); *Odgers v. Ortho Pharmeceutical Corp,* 609 F.Supp. 867 (E.D.Mich 1985); *Stephens v. G.D. Searle,* 602 F.Supp. 379 (E.D.Mich.1985).

Although plaintiffs' argument has merit, this Court is unwilling to deviate from the overwhelming majority of decisions that have applied the learned intermediary rule to cases involving contraceptives. *Beyette v. Ortho Pharmaceutical Corp.,* 823 F.2d 990 (6th Cir.1987) (IUD); *Dupre v. G.D. Searle,* Case No. C84–146–L (D.N.H.1987) (Cu–7 IUD); *Goodson v. Searle Laboratories,* 471 F.Supp. 546 (D.Conn.1978) (oral contraceptive); *Chambers v. G.D. Searle,*

441 F.Supp. 377 (D.Md.1975), *aff'd*, 567 F.2d 269 (4th Cir.1977) (oral contraceptive); *Cobb v. Syntex Laboratories*, 444 So.2d 203 (La.App.1983); *McKee v. Moore*, 648 P.2d 21 (Okla.1982) (IUD); *Seley v. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981) (oral contraceptive); *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541 (1979) (oral contraceptive); *Terhune v. A.H. Robins*, 90 Wash.2d 9, 577 P.2d 975, 978 (1978) (IUD); *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522 (1974) (oral contraceptive); *Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 307 A.2d 449 (1973) (oral contraceptive).

The rationale for the majority trend is best set forth in *Terhune*, 577 P.2d 975, where the court wrote:

> While recognizing the efficacy of this rule as applied to prescription drugs, the plaintiffs question its applicability to devices such as the Dalkon Shield. In advising upon the selection of a contraceptive, they say, the physician is not attempting to cure a malady and does not "rely upon his many years of education and experience" to select an appropriate medication. We do not see this as a significant distinction. The physician does not confine his practice to the curing of maladies. He is concerned with the total health and physical well-being of his patients and appropriately gives advice upon preventative measures. Certainly the insertion of the Dalkon Shield requires a physician's services, his knowledge and his skill. While the physician does not make the final choice but leaves that to the patient, he advises the patient with respect to the advantages and disadvantages of various choices ...
>
> [I]t is he who supplies and inserts the device.

> .    .    .    .    .

In any situation which may come to mind, the patient is expected to look to the physician for guidance and not to the manufacturer of the products which he may use or prescribe in the course of treatment.

*Id.* at 978.

The Court is satisfied that such logic is applicable here [7]. Accordingly, plaintiffs' motion for declaratory judgment and summary judgment is denied.

## B. CONTRIBUTORY NEGLIGENCE

■ Under Fed.R.Civ.P. 56(d), partial summary judgment may be invoked to dismiss an affirmative defense. *County of Hennepin v. Aetna Casualty and Surety*, 587 F.2d 945 (8th Cir.1978). The party opposing summary judgment has the burden to establish the existence of an issue of fact which is genuine and material. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Defendant's fourth affirmative defense states:

> If plaintiffs sustained any injuries or damages as alleged in the complaint, or otherwise, the same were directly and proximately caused or contributed to by the acts and conduct of plaintiffs themselves.

Defendant suggests that the basis for this affirmative defense is information in Esther Kociemba's medical records which indicates she engaged in behavior that placed her at higher risk for PID. Presumably, this allegation refers to the fact that plaintiff had five different sexual partners since she became sexually active at age 16.

Defendant concedes that it has not developed the factual support to preclude sum-

---

**7.** Esther Kociemba received her Cu–7 on June 6, 1977. On November 7, 1977, an FDA regulation codified at 21 C.F.R. § 310.502, took effect requiring manufacturers of drug IUDs to include warnings to each IUD user. Since this regulation was not in effect at the time Esther Kociemba received her Cu–7, this Court need not address the issue of whether Searle had a duty pursuant to the regulation to warn plaintiff. *But see Lukaszewicz v. Ortho Pharmaceutical Corp.* 510 F.Supp. 961, *amended*, 532 F.Supp. 211 (E.D.Wis.1981) (holding that warnings to the consumer are required as a matter of law once 21 C.F.R. § 310.502 took effect on November 7, 1977).

mary judgment on this motion. Defendant cites the Court's September 9, 1987 Order restricting inquiry into the sexual histories of the plaintiff and her partners as the reason it lacks sufficient factual support. Defendant further argues that "additional relevant facts *may* come to light at trial." Memorandum in Support of Searle's Opposition to Plaintiffs' Motion for Partial Summary Judgment on Contributory Negligence, p. 3.

The Court is of the opinion that the evidence which Searle has been precluded from obtaining is not synonymous with evidence of contributory negligence. The defendant's second argument that "facts may come to light at trial" is pure speculation.

Defendant, as the party opposing summary judgment, has not met its burden to establish the existence of an issue of genuine and material fact. Therefore, this Court grants plaintiffs' motion of summary judgment to dismiss defendant's fourth affirmative defense alleging contributory negligence.

### ORDER

Based on the foregoing, and a review of the entire file and record, IT IS HEREBY ORDERED that defendant's four dispositive motions seeking summary judgment are denied.

IT IS FURTHER ORDERED that plaintiffs' motion seeking a declaratory judgment, and alternatively, summary judgment on the issue of defendant's duty to directly warn plaintiff is denied.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment as to defendant's fourth affirmative defense, alleging contributory negligence, is granted.

FINALLY, IT IS ORDERED that plaintiffs' motion to dismiss defendant's fifth, tenth, and eleventh affirmative defenses, alleging failure to mitigate damages, lack of personal jurisdiction, and improper venue, respectively, is granted.